UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

04 - 12461 GAO

| | | |
|---|---|---|
| ALFRED FELICIANO, | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | MAGISTRATE JUDGE ___Dein___ |
| v. | ) | |
| GLOBALWARE SOLUTIONS, INC., | ) | **COMPLAINT AND JURY DEMAND** |
| TONY RUDSTON, and | ) | RECEIPT # _62304_ |
| GARY LORTIE | ) | AMOUNT $ _150_ |
| Defendants. | ) | SUMMONS ISSUED _yes_ |
| | ) | LOCAL RULE 4.1_____ |
| | | WAIVER FORM_____ |
| | | MCF ISSUED_____ |
| | | BY DPTY. CLK._____ |
| | | DATE of Plaintiff _11 22 04_ |

**INTRODUCTION**

This is an action for damages and other relief arising out the employment of Plaintiff Alfred Feliciano ("Plaintiff" or "Feliciano") by Defendant Globalware Solutions, Inc. ("Globalware"), Tony Rudston ("Rudston"), and Gary Lortie ("Lortie") (collectively "Defendants"). Mr. Feliciano's claims include breach of contract, fraud, violation of the Payment of Wages Law, violations of his rights under the Employment Retirement Income Security Act of 1974 ("ERISA"), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), 29 U.S.C. § 1161, *et seq.*, and breach of the implied covenant of good faith and fair dealing.

**PARTIES**

1.      Plaintiff Feliciano is an individual residing at 2607 Oakbrook Court, Weston, Florida. Plaintiff is over the age of 40.

2.      Defendant Globalware is a Delaware corporation, with its principal place of business at 200 Ward Hill Avenue, Haverhill, Essex County, Massachusetts.

3.      On information and belief, Defendant Rudston is the Chief Executive Officer of

Globalware.

4.      On information and belief, Defendant Lortie is the Chief Financial Officer of Globalware. He resides at 9 Walnut Hill Road, Millis, Massachusetts.

## JURISDICTION AND VENUE

5.      The District Court of the United States for the District of Massachusetts has original jurisdiction of this matter under the provisions of 28 U.S.C. §§ 1331 and 1332 in that it is a civil action arising under the laws of the United States, specifically the Employee Retirement Security Act ("ERISA"), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"). Furthermore, there is complete diversity of citizenship among the parties and the amount-in-controversy exceeds $75,000.

## FACTUAL BACKGROUND

### Feliciano's Employment Contract

6.      In or about June 2000, Globalware entered into a contract with Feliciano in which it agreed to employ him as its Chief Resource Officer for a term of five years (the "Contract").

7.      The terms of the Contract, memorialized at a later date by Globalware's then Chief Executive Officer, James Bartlett, consisted of: an annual salary of $200,000; medical, dental and disability insurance, including short and long term disability, life insurance; monthly car allowance of $600; severance payment equaling six (6) months pay in the event of dismissal without cause before the expiration of the Contract; continued health benefits during the six month severance period; and 4.5% commission payment for all transactions.

8.      The Contract also provided pursuant to the "Incentive Stock Option Agreement," Globalware conveyed 200,000 shares in Globalware to Feliciano which would incrementally vest

2

over 4 years.  See, a true and accurate copy of the "Incentive Stock Option Agreement," attached

hereto as Exhibit A (the "Option Agreement").

9.      Globalware has refused to comply with the terms of the Option Agreement.

10.     In early 2002, Globalware encountered financial difficulties.  In an attempt to navigate its

financial difficulty, Globalware requested that certain executives defer portions of their salary so

that Globalware could strengthen its financial condition.  Feliciano, along with several other

employees, agreed to defer 50% of his salary, or $100,000.  He did so with Globalware's express

agreement that this $100,000 would be repaid to Feliciano in 2003.

11.     The Contract also provided that Feliciano was to receive a commission of 4.5% of any

contract generated by Feliciano.

12.     In December 2000, Feliciano closed on a deal with Avaya, Inc. in the amount of

approximately $1,300,000.

13.     Accordingly, Feliciano was entitled to a commission payment for the Avaya deal in the

amount of $58,500.

14.     Globalware refused to make this payment to Feliciano.

### Feliciano's Accident and Globalware's Insurance Fraud

15.     On September 27, 2002, while performing duties related to his employment with

Globalware, Feliciano was involved in an automobile accident.  As a result of the accident,

Feliciano suffered four herniated discs in his neck.  Feliciano also suffered extensive nerve

damage in his back and neck.

16.     Shortly thereafter, Feliciano discussed the accident and his injuries with Globalware.

Despite Feliciano's request to file a workers' compensation claim, Globalware convinced him

3

not to file such a claim because it would pay all of his medical bills and salary.

17.     As a result of these injuries, Feliciano was forced to go on short term disability leave. On or about October 17, 2002, Feliciano received the first disability payment from Globalware, which was purportedly reimbursed for these payments by Hartford Life and Accident Insurance Company ("Hartford").

18.     In addition to his short term disability policy with Hartford (the "Hartford Policy"), Feliciano also opted to participate in Globalware's supplemental disability policy with Colonial Insurance (the "Colonial Policy").

19.     Feliciano enrolled in the Colonial Policy in order to provide himself with additional coverage in excess of the Hartford Policy (which only covered a portion of his full salary) in the event of his disability.

20.     In order to pay the premium for the Colonial Policy, Globalware deducted $13.83 from Feliciano's weekly paycheck which it then transferred to Colonial for payment.

21.     On or about May 10, 2002, despite continuing to deduct monies from Feliciano's paycheck for the Colonial Policy premium, Globalware ceased making payments to Colonial for the Colonial Policy on behalf of Feliciano. Globalware never notified Feliciano that it had stopped making these payments. Because Globalware continued to withdraw the $13.83 from Feliciano's weekly paycheck, Feliciano was unaware that Globalware had allowed the Colonial Policy to lapse.

22.     It was not until late 2002, after he suffered his injury and attempted to collect on his supplemental disability, that Feliciano first discovered that the Colonial Policy had lapsed and he no longer had this supplemental disability coverage.

4

23.    As an employee of Globalware with a salary of $50,000 or more, Feliciano was

automatically enrolled in the long term disability program with Sun Life Assurance (the "Sun

Life Policy").  On information and belief, Feliciano was entitled to disability payments if he

could not return to work after six months of short term disability leave.

24.    Because of the severity of the injuries suffered on September 27, 2002, Feliciano was

unable to return to work after six months.  Globalware never apprised Feliciano of his rights to

file for disability payments pursuant to the Sun Life Policy.

### Globalware's Ratification of the Contract and its Breach

25.    In December 2002, Feliciano requested that its then Chief Executive Officer, James

Bartlett, memorialize, *inter alia,* the terms of his employment agreement consistent with the

Contract.

26.    In January 2003, Mr. Bartlett prepared the document, in which he confirmed the primary

terms of Feliciano's employment, including but not limited to the following: Globalware still

owed Feliciano his deferred salary of $100,000; he was under contract through May 2005; he was

to receive 200,000 shares of Globalware, fully vested in 4 years; commission payment for the

Avaya deal (see para. 12); and in excess of $52,000 in reimbursable expenses.  See, a true and

accurate copy Bartlett's 2003 Employment Memo, attached hereto as Exhibit B.

27.    In March 2003, Globalware suddenly stopped making payments to Feliciano.  It failed to

provide him with any written notification that they were stopping the payments, nor did it give

him any reason for stopping the payments.  To date, Feliciano has never received any

communication from Globalware concerning the cessation of these payments.

28.    In an attempt to ascertain the reason for the stopped payments, Feliciano contacted

Globalware and requested that it provide him with a copy of his personnel file. Globalware, and more specifically Bradley Jay, Managing Director of Mezzanine Management Company, refused this request. Mr. Jay also refused to return any of Feliciano's personal items from his work area.

29.    In or about the Spring of 2003, Feliciano spoke with Globalware's new CEO, Tony Rudston. When Feliciano asked about the status of his unpaid expenses, which totaled over $53,000, Mr. Rudston simply told him to stand in line with the other creditors. Rather than attempt to work with Feliciano regarding the reimbursement of these expenses, Rudston told Feliciano to file a lawsuit.

30.    In early 2003, Feliciano presented three Globalware checks totaling $6,665.89 to his bank for payment. All three checks were returned to Feliciano unpaid because of insufficient funds.

31.    On information and belief, Feliciano has since learned that Globalware terminated his employment in March of 2003. Globalware did not provide Feliciano with any notice, either verbal or written, of the termination, nor did it pay him his unpaid wages and expenses, or advise him concerning his rights with regard to other benefits.

### Globalware's COBRA and ERISA Violations

32.    Globalware also failed to provide Feliciano with any notice of his rights to continue his health insurance coverage pursuant to COBRA. Incredibly, despite being advised that Globalware was required to provide such notice, the Director of Human Resources, Richard Dauphinais, advised Globalware's insurance broker that he was not going to concern himself with the COBRA notification requirements.

33.    In addition to failing to provide Feliciano with notice of his COBRA rights, Globalware also failed to extend or continue Feliciano's health insurance benefits.

6

34.    In June 2003, Benefirst Health Insurance cancelled Feliciano's health insurance policy, leaving Feliciano, his spouse and children, without any health insurance.  Because of the termination of his health insurance, Feliciano was forced to cancel several doctor's and therapist's appointments because he was no longer covered.

35.    Because he was forced to miss these appointments, Feliciano's condition worsened, both emotionally and physically.

36.    Feliciano has incurred significant medical expenses that would have been covered by his health insurance with Globalware had it been active, as it should have been.  These medical bills are in excess of $75,000.

37.    Globalware also failed to provide Feliciano with notice of his rights pursuant to the Stock Option Plan, or his rights concerning Globalware's pension plan.

38.    On or about August 3, 2003, Feliciano applied for unemployment compensation.  He was shocked to discover that Globalware had terminated his position in March 2003, and moreover that Globalware had grossly under reported his wages.

39.    Globalware's fraudulent and callous conduct has caused Feliciano to suffer severe emotional and physical injuries, including, but not limited to emotional distress over the mounting medical bills and the unnecessary exacerbation of his serious physical injuries.

### COUNT I
### (Breach of Contract - Feliciano v. Globalware)

40.    Feliciano repeats and incorporates herein by reference the allegations of Paragraphs 1-39 above.

41.    In or about June 2000, Globalware entered into the Contract with Feliciano to employ

him for a period of five years at a base salary of $200,000. The Contract contained several other important terms, as further set out in Exhibit B.

42.    By terminating Feliciano's employment without cause and in violation of the Contract and by its failure to comply with the other terms of the Contract, Globalware breached the Contract.

43.    Globalware also breached the terms of the Option Agreement.

44.    Globalware's breach of the Contract and the Option Agreement has caused Feliciano significant financial, emotional, and physical damages.

### COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing
### Feliciano v. Globalware)

45.    Feliciano repeats and incorporates herein by reference the allegations of Paragraphs 1-44 above.

46.    Globalware breached the implied covenant of good faith and fair dealing by wrongfully terminating Feliciano in violation of the Contract and by refusing to perform its obligations under the Option Agreement.

47.    Globalware's actions have deprived Feliciano of the fruits and benefits of the Contract and the Option Agreement. These fruits, include, but are not limited to, Feliciano's vested vacation benefits and reimbursable expenses, loss of vested stock options, loss of income, loss of benefits and loss of professional opportunities.

48.    As a result of Globalware's breach of the implied covenant of good faith and fair dealing, Feliciano suffered substantial emotional, physical, and financial damages.

8

**COUNT III**
**(Violation of Payment of Wages Law - G.L. c. 149, 27C, 148 and 150 –**
**Feliciano v. all Defendants)**

49.     Feliciano repeats and incorporates herein by reference paragraphs 1 through 48 above.

50.     Globalware employed Feliciano and agreed to pay him an annual salary of $200,000,

deferred salary, vested vacation benefits, stock options and commission. Defendants' were to

pay these wages on a weekly basis. Defendants' failed to pay Feliciano his wages and the

aforementioned benefits.

51.     Defendants' failure to pay Feliciano his full wages, vested vacation benefits, earned

commissions, vested stock options, and reimbursable expenses on a timely basis are willful acts

in violation of Massachusetts General Laws, Chapter 149.

52.     Defendants' failure to pay Feliciano his wages on a timely basis is a violation of the

Payment of Wages Law, sections 27C, 148 and 150 of Chapter 149 of the General Laws of

Massachusetts.

53.     Plaintiff Feliciano complied with all procedural prerequisites as articulated in G.L. c. 149,

and has received written approval from the Massachusetts Attorney General to pursue his wage

claims against Defendants.

54.     Feliciano has suffered extensive damages as a result of Defendants' violations of G.L. c.

149.

55.     As the result of Defendants' willful failure to pay Feliciano's wages, Feliciano is entitled

to recover multiple damages, statutory fines, attorney's fees and litigation costs.

## COUNT IV
### (Fraud - Feliciano v. Globalware)

56.    Feliciano repeats and incorporates herein by reference paragraphs 1 through 55 above.

57.    Globalware engaged in fraud by ceasing payments to Colonial for Feliciano's Colonial

Policy, while continuing to withdraw and retain premium payments from Feliciano's weekly

paycheck, thereby leading Feliciano to believe that his Colonial Policy remained active.

58.    Globalware never notified Feliciano that it had stopped making the premium payments to

Colonial on his behalf or that the Colonial Policy had lapsed.

59.    Globalware also engaged in fraud by persuading Feliciano to forego his statutory right to

file for and collect workers' compensation payments based on the promise that it would

compensate him instead.

60.    As a result of Globalware's fraud, Feliciano suffered significant damages.

## COUNT V
### (Violation of 29 U.S.C. § 1162 - Feliciano v. Globalware)

61.    Feliciano repeats and incorporates herein by reference paragraphs 1 through 60 above.

62.    The acts and practices of Globalware alleged above constitute an unlawful failure to

extend continuation coverage of health benefits to Feliciano as required by 29 U.S.C. § 1162.

63.    Globalware's aforementioned conduct was done willfully and intentionally, and as a

result Feliciano suffered significant damages.

## COUNT VI
### (Violation of 29 U.S.C. § 1166 - Feliciano v. Globalware)

64.    Feliciano repeats and incorporates herein by reference paragraphs 1 through 61 above.

65.    The acts and practices of Globalware alleged above constitute an unlawful failure to

notify Feliciano of his right to continuation coverage of health benefits as required by 29 U.S.C. § 1166.

66.   Globalware's aforementioned conduct was done willfully and intentionally, and as a result Feliciano suffered significant damages.

WHEREFORE, Feliciano demands:

i.   That the Court enter judgment in favor of Feliciano on each Count of the Complaint;

ii.   That the Court enter judgment in his favor and against all Defendants on Count III of the Complaint for Defendants' violation of G.L. c. 149, 27C, 148 and 150 for multiple damages, plus costs, interest, and attorney's fees;

iii.   That the Court enter judgment in his favor and against Globalware on Count V of the Complaint for damages, plus costs, interest, and attorney's fees;

iv.   That the Court enter judgment in his favor and against Globalware on Count VI of the Complaint and assess a statutory penalty of $110 per day for each day of Globalware's failure to comply with COBRA, plus costs, interest, and attorney's fees;

v.   That the Court award Feliciano his attorney's fees, interest and the costs of suit; and

vi.   That the Court enter such additional relief as it deems just and equitable.

JURY DEMAND

Feliciano hereby demands a trial by jury on all issues so triable.

Respectfully submitted,
**ALFRED FELICIANO**

By his attorneys,

Joseph L. Demeo, BBO# 561254
Christopher M. Waterman, BBO# 641190
Demeo & Associates, P.C.
One Lewis Wharf
Boston, MA 02110
(617) 263-2600

Dated: November 22, 2004

GLOBALWARE SOLUTIONS, INC.

Incentive Stock Option Agreement
Granted Under 2000 Employee, Director and Consultant Stock Option Plan

1.    Grant of Option.

This agreement evidences the grant by GlobalWare Solutions, Inc., a Delaware corporation (the "Company"), on March 1, 2000 (the "Grant Date") to Alfred Feliciano, an employee of the Company (the "Participant"), of an option to purchase (the "Option"), in whole or in part, on the terms provided herein and in the Company's 2000 Employee, Director and Consultant Stock Option Plan (the "Plan"), a total of 200,000 shares (the "Shares") of common stock, $.01 par value per share, of the Company ("Common Stock"), at $1.54 per Share. Unless earlier terminated, this Option shall expire on February 28, 2010 (the "Final Exercise Date").

It is intended that the Option evidenced by this agreement shall be an incentive stock option as defined in Section 422 of the Internal Revenue Code of 1986, as amended and any regulations promulgated thereunder (the "Code"). Except as otherwise indicated by the context, the term "Participant", as used in this Option, shall be deemed to include any person who acquires the right to exercise this Option validly under its terms.

2.    Vesting.

(a)    Normal Vesting. Subject to Section 2(b) below, this Option will become exercisable ("vest") as to 20% of the original number of Shares on the first anniversary of the Grant Date, as to an additional 20% of the original number of Shares on the second anniversary of the Grant Date, and as to an additional 30% of the original number of Shares on each of the third and fourth anniversaries of the Grant Date. The right of exercise shall be cumulative so that to the extent the Option is not exercised in any period to the maximum extent permissible it shall continue to be exercisable, in whole or in part, with respect to all shares for which it is vested until the earlier of the Final Exercise Date or the termination of this Option under Section 3 hereof or the Plan.

(b)    Effect of Reorganization Event. Upon the occurrence of a Reorganization Event (as defined below) (regardless of whether such event also constitutes a Change in Control Event (as defined below)), or the execution by the Company of any agreement with respect to a Reorganization Event (regardless of whether such event will result in a Change in Control Event), the Board shall provide that this Option shall be assumed, or an equivalent option shall be substituted, by the acquiring or succeeding corporation (or an affiliate thereof); provided that if such Reorganization Event also constitutes a Change in Control Event, except to the extent specifically provided to the contrary in any agreement between the Participant and the Company, such assumed or substituted option shall be immediately exercisable in full upon the occurrence of such Reorganization Event. For purposes hereof, the Option shall be considered to be assumed if, following consummation of the Reorganization Event, the Option confers the right to purchase, for each share of Common Stock subject to the Option immediately prior to the consummation of the Reorganization Event, the consideration (whether cash, securities or other

property) received as a result of the Reorganization Event by holders of Common Stock for each share of Common Stock held immediately prior to the consummation of the Reorganization Event (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares of Common Stock); provided, however, that if the consideration received as a result of the Reorganization Event is not solely common stock of the acquiring or succeeding corporation (or an affiliate thereof), the Company may, with the consent of the acquiring or succeeding corporation, provide for the consideration to be received upon the exercise of the Option to consist solely of common stock of the acquiring or succeeding corporation (or an affiliate thereof) equivalent in fair market value to the per share consideration received by holders of outstanding shares of Common Stock as a result of the Reorganization Event.

Notwithstanding the foregoing, if the acquiring or succeeding corporation (or an affiliate thereof) does not agree to assume, or substitute for, the Option, then the Board shall, upon written notice to the Participant, provide that the then unexercised portion of the Option will become exercisable in full as of a specified time prior to the Reorganization Event and will terminate immediately prior to the consummation of such Reorganization Event, except to the extent exercised by the Participant before the consummation of such Reorganization Event; provided, however, in the event of a Reorganization Event under the terms of which holders of Common Stock will receive upon consummation thereof a cash payment for each share of Common Stock surrendered pursuant to such Reorganization Event (the "Acquisition Price"), then the Board may instead provide that the Option shall terminate upon consummation of such Reorganization Event and that the Participant shall receive, in exchange therefor, a cash payment equal to the amount (if any) by which (A) the Acquisition Price multiplied by the number of shares of Common Stock subject to the Option (whether or not then exercisable), exceeds (B) the aggregate exercise price of the Option. To the extent all or any portion of the Option becomes exercisable solely as a result of the first sentence of this paragraph, upon exercise of the Option the Participant shall receive shares subject to a right of repurchase by the Company or its successor at the Option exercise price. Such repurchase right (1) shall lapse at the same rate as the Option would have become exercisable under its terms and (2) shall not apply to any shares subject to the Option that were exercisable under its terms without regard to the first sentence of this paragraph.

(c)     Effect of Change in Control Event that is not a Reorganization Event. Upon the occurrence of a Change in Control Event that does not also constitute a Reorganization Event, except to the extent specifically provided to the contrary in any agreement between the Participant and the Company, the Option shall automatically become immediately exercisable in full.

(d)     Definitions. For purposes of this Agreement:

(1)     A "Reorganization Event" shall mean:

(i)     any merger or consolidation of the Company with or into another entity as a result of which all of the Common Stock of the Company is converted into or exchanged for the right to receive cash, securities or other property; or

(ii)     any exchange of all of the Common Stock of the Company for cash, securities or other property pursuant to a share exchange transaction.

(2)     A "Change in Control Event" shall mean:

(i)     the acquisition by an individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act) (a "Person") of beneficial ownership of any capital stock of the Company if, after such acquisition, such Person beneficially owns (within the meaning of Rule 13d-3 promulgated under the Exchange Act) 50% or more of either (x) the then-outstanding shares of common stock of the Company (the "Outstanding Company Common Stock") or (y) the combined voting power of the then-outstanding securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change in Control Event: (A) any acquisition directly from the Company (excluding an acquisition pursuant to the exercise, conversion or exchange of any security exercisable for, convertible into or exchangeable for common stock or voting securities of the Company, unless the Person exercising, converting or exchanging such security acquired such security directly from the Company or an underwriter or agent of the Company), (B) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company, (C) any acquisition by any corporation pursuant to a Business Combination (as defined below) which complies with clauses (x) and (y) of subsection (iii) of this definition, or (D) any acquisition by James Bartlett ("Bartlett") of any shares of Common Stock; or

(ii)     the consummation of a merger, consolidation, reorganization, recapitalization or share exchange involving the Company or a sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"), unless, immediately following such Business Combination, each of the following two conditions is satisfied: (x) all or substantially all of the individuals and entities who were the beneficial owners of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of the then-outstanding shares of common stock and the combined voting power of the then-outstanding securities entitled to vote generally in the election of directors, respectively, of the resulting or acquiring corporation in such Business Combination (which shall include, without limitation, a corporation which as a result of such transaction owns the Company or substantially all of the Company's assets either directly or through one or more subsidiaries) (such resulting or acquiring corporation is referred to herein as the "Acquiring Corporation") in substantially the same proportions as their ownership of the Outstanding Company Common Stock and Outstanding Company Voting Securities, respectively, immediately prior to such Business Combination and (y) no Person (excluding Bartlett, the Acquiring Corporation or any employee benefit plan (or related trust) maintained or sponsored by the Company or by the Acquiring Corporation) beneficially owns, directly or indirectly, 50% or more of the then-outstanding shares of common stock of the Acquiring Corporation, or of the combined voting power of the then-outstanding securities of such corporation entitled to vote generally in the election of directors (except to the extent that such ownership existed prior to the Business Combination).

3.    Exercise of Option.

(a)    Form of Exercise. Each election to exercise this Option shall be in writing, signed by the Participant, and received by the Company at its principal office, accompanied by this agreement, and payment in full in the following manner:

(1)    in cash or by check, payable to the order of the Company;

(2)    by (i) delivery of an irrevocable and unconditional undertaking by a creditworthy broker to deliver promptly to the Company sufficient funds to pay the exercise price and any required tax withholding or (ii) delivery by the Participant to the Company of a copy of irrevocable and unconditional instructions to a creditworthy broker to deliver promptly to the Company cash or a check sufficient to pay the exercise price and any required tax withholding;

(3)    when the Common Stock is registered under the Securities Exchange Act of 1934 (the "Exchange Act"), by delivery of shares of Common Stock owned by the Employee valued at their fair market value as determined by (or in a manner approved by) the Board of Directors of the Company (the "Board") in good faith ("Fair Market Value"), provided (i) such method of payment is then permitted under applicable law and (ii) such Common Stock, if acquired directly from the Company, was owned by the Participant at least six months prior to such delivery;

(4)    by (i) delivery of a promissory note of the Participant to the Company on terms determined by the Board and at the Board's sole discretion, or (ii) payment of such other lawful consideration as the Board may determine; or

(5)    by any combination of the above permitted forms of payment.

(b)    The Participant may purchase less than the number of shares covered hereby, provided that no partial exercise of this Option may be for any fractional share.

(c)    Continuous Relationship with the Company Required. Except as otherwise provided in this Section 3, this Option may not be exercised unless the Participant, at the time he or she exercises this Option, is, and has been at all times since the Grant Date, an employee, officer or director of, or consultant or advisor to, the Company or any parent or subsidiary of the Company as defined in Section 424(e) or (f) of the Code (an "Eligible Participant").

(d)    Termination of Relationship with the Company. If the Participant ceases to be an Eligible Participant for any reason, then, except as provided in paragraphs (d) and (e) below, the right to exercise this Option shall terminate thirty days after such cessation (but in no event after the Final Exercise Date), provided that this Option shall be exercisable only to the extent that the Participant was entitled to exercise this Option on the date of such cessation. Notwithstanding the foregoing, if the Participant, prior to the Final Exercise Date, violates the non-competition or confidentiality provisions of any employment contract, confidentiality and nondisclosure

- 4 -

agreement or other agreement between the Participant and the Company, the right to exercise this Option shall terminate immediately upon written notice to the Participant from the Company describing such violation.

(e)     Exercise Period Upon Death or Disability.  If the Participant dies or becomes disabled (within the meaning of Section 22(e)(3) of the Code) prior to the Final Exercise Date while he or she is an Eligible Participant and the Company has not terminated such relationship for "cause" as specified in paragraph (e) below, this Option shall be exercisable, within the period of six months following the date of death or disability of the Participant by the Participant, provided that this Option shall be exercisable only to the extent that this Option was exercisable by the Participant on the date of his or her death or disability, and further provided that this Option shall not be exercisable after the Final Exercise Date.

(f)     Discharge for Cause.  If the Participant, prior to the Final Exercise Date, is discharged by the Company for "cause" (as defined below), the right to exercise this Option shall terminate immediately upon the effective date of such discharge.  "Cause" shall mean willful misconduct by the Participant or willful failure by the Participant to perform his or her responsibilities to the Company (including, without limitation, breach by the Participant of any provision of any employment, consulting, advisory, nondisclosure, non-competition or other similar agreement between the Participant and the Company), as determined by the Company, which determination shall be conclusive.  The Participant shall be considered to have been discharged for "Cause" if the Company determines, within 30 days after the Participant's resignation, that discharge for cause was warranted.

4.     Right of First Refusal.

(a)     If the Participant proposes to sell, assign, transfer, pledge, hypothecate or otherwise dispose of, by operation of law or otherwise (collectively, "transfer") any Shares acquired upon exercise of this Option, then the Participant shall first give written notice of the proposed transfer (the "Transfer Notice") to the Company.  The Transfer Notice shall name the proposed transferee and state the number of such Shares the Participant proposes to transfer (the "Offered Shares"), the price per share and all other material terms and conditions of the transfer.

(b)     For 60 days following its receipt of such Transfer Notice, the Company shall have the option to purchase all (but not less than all) of the Offered Shares at the price and upon the terms set forth in the Transfer Notice.  In the event the Company elects to purchase all of the Offered Shares, it shall give written notice of such election to the Participant within such 60-day period.  Within 10 days after his receipt of such notice, the Participant shall tender to the Company at its principal offices the certificate or certificates representing the Offered Shares, duly endorsed in blank by the Participant or with duly endorsed stock powers attached thereto, all in a form suitable for transfer of the Offered Shares to the Company.  Promptly following receipt of such certificate or certificates, the Company shall deliver or mail to the Participant a check in payment of the purchase price for the Offered Shares;  provided that if the terms of payment set forth in the Transfer Notice were other than cash against delivery, the Company may pay for the Offered Shares on the same terms and conditions as were set forth in the Transfer Notice; and provided further that any delay in making such payment shall not invalidate the Company's exercise of its option to purchase the Offered Shares.

- 5 -

(c)     If the Company does not elect to acquire all of the Offered Shares, the Participant may, within the 60-day period following the expiration of the option granted to the Company under subsection (b) above, transfer the Offered Shares to the proposed transferee, provided that such transfer shall not be on terms and conditions more favorable to the transferee than those contained in the Transfer Notice.  Notwithstanding any of the above, all Offered Shares transferred pursuant to this Section 4 shall remain subject to the right of first refusal set forth in this Section 4 and such transferee shall, as a condition to such transfer, deliver to the Company a written instrument confirming that such transferee shall be bound by all of the terms and conditions of this Section 4.

(d)     After the time at which the Offered Shares are required to be delivered to the Company for transfer to the Company pursuant to subsection (b) above, the Company shall not pay any dividend to the Participant on account of such Offered Shares or permit the Participant to exercise any of the privileges or rights of a stockholder with respect to such Offered Shares, but shall, in so far as permitted by law, treat the Company as the owner of such Offered Shares.

(e)     The following transactions shall be exempt from the provisions of this Section 4:

(1)     any transfer of Shares to or for the benefit of any spouse, child or grandchild of the Participant, or to a trust for their benefit;

(2)     any transfer pursuant to an effective registration statement filed by the Company under the Securities Act of 1933, as amended (the "Securities Act"); and

(3)     the sale of all or substantially all of the shares of capital stock of the Company (including pursuant to a merger or consolidation);

provided, however, that in the case of a transfer pursuant to clause (1) above, such Shares shall remain subject to the right of first refusal set forth in this Section 4 and such transferee shall, as a condition to such transfer, deliver to the Company a written instrument confirming that such transferee shall be bound by all of the terms and conditions of this Section 4.

(f)     The Company may assign its rights to purchase Offered Shares in any particular transaction under this Section 4 to one or more persons or entities.

(g)     The provisions of this Section 4 shall terminate upon the earlier of the following events:

(1)     the closing of the sale of shares of Common Stock in an underwritten public offering pursuant to an effective registration statement filed by the Company under the Securities Act; or

(2)     the sale of all or substantially all of the capital stock, assets or business of the Company, by merger, consolidation, sale of assets or otherwise (other than a merger or consolidation in which all or substantially all of the individuals and entities who were beneficial owners of the Common Stock immediately prior to such transaction beneficially own, directly or indirectly, more than 75% of the outstanding securities entitled to vote generally in the election of directors of the resulting, surviving or acquiring corporation in such transaction).

(h)    The Company shall not be required (a) to transfer on its books any of the Shares which shall have been sold or transferred in violation of any of the provisions set forth in this Section 4, or (b) to treat as owner of such Shares or to pay dividends to any transferee to whom any such Shares shall have been so sold or transferred.

5.    Agreement in Connection with Public Offering.

The Participant agrees, in connection with the initial underwritten public offering of the Company's securities pursuant to a registration statement under the Securities Act, (i) not to sell, make short sale of, loan, grant any options for the purchase of, or otherwise dispose of any shares of Common Stock held by the Participant (other than those shares included in the offering) without the prior written consent of the Company or the underwriters managing such initial underwritten public offering of the Company's securities for a period of 180 days from the effective date of such registration statement, and (ii) to execute any agreement reflecting clause (i) above as may be requested by the Company or the managing underwriters at the time of such offering.

6.    Withholding.

No Shares will be issued pursuant to the exercise of this Option unless and until the Participant pays to the Company, or makes provision satisfactory to the Company for payment of, any federal, state or local withholding taxes required by law to be withheld in respect of this Option.

7.    Nontransferability of Option.

This Option may not be sold, assigned, transferred, pledged or otherwise encumbered by the Participant, either voluntarily or by operation of law, except by will or the laws of descent and distribution, and, during the lifetime of the Participant, this Option shall be exercisable only by the Participant.

8.    Disqualifying Disposition.

If the Participant disposes of Shares acquired upon exercise of this Option within two years from the Grant Date or one year after such Shares were acquired pursuant to exercise of this Option, the Participant shall notify the Company in writing of such disposition.

9.    Provisions of the Plan.

This Option is subject to the provisions of the Plan, a copy of which is furnished to the Participant with this Option.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the Company has caused this Option to be executed under its corporate seal by its duly authorized officer.  This Option shall take effect as a sealed instrument.

GlobalWare Solutions, Inc.

Dated: March 1, 2000                    By:     _____

                                        Name:    James R. Bartlett
                                        Title:    Chief Executive Officer

- 8 -

## PARTICIPANT'S ACCEPTANCE

The undersigned hereby accepts the foregoing Option and agrees to the terms and conditions thereof. The undersigned hereby acknowledges receipt of a copy of the Company's 2000 Employee, Director and Consultant Stock Option Plan.

PARTICIPANT:

Address: _2607 Oakbrook Ct._

_Weston Florida 3333:_

PARTICIPANT'S SPOUSE (if Participant is a resident of Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington or Wisconsin):

_____

Address: _____

_____

- 9 -

*exhibit c*



**globalware™**
s o l u t i o n s

I, James B Bartlett Chairmen and CEO of GlobalWare Solutions, wish to confirm and memorialize the conditions of employment, and business relationship Mr. Alfred Feliciano has with GlobalWare Solutions, Inc.

The terms of his engagement were as follows:

- Title: Chief Strategy Officer & Executive Vice President
- Term (5) years June 1, 2001 – ending May 31, 2005
- Annual salary of $200,000
- Annual Bonus of 30% of annual salary
- Full Executive Benefits (Short and long term disability insurance, Life insurance, Health, Dental, 401 K etc)
- Full re-imbursement for all business expenses for all GWS Locations and business travel including Florida Office.
- Monthly car allowance of $600.00 plus operating expenses
- 200,000 shares in the company to be vested over 4 years
- 6 month severance in the event of dismissal or separation from the company without cause, plus continued health benefits for the term of the severance period
- Commissions for large transactions paid at 4.5% of gross revenue (he is owed $76,500 for the initial Avaya Content management development contract (The first PO of $1.7 Million).
- Mr. Feliciano took a voluntary reduction in pay for six months in 2002, which the company committed to payback in 2003.

Additionally Mr. Feliciano hold back expenses from fiscal year 2001 & 2002 which we committed to pay him for. Mr. Feliciano submitted a total of 52 K + in expenses to GWS over a 6 month period which to my knowledge he has yet to collect, and is clearly entitled to. These were submitted approved expenses and due to a lack of funds these expenses have not been paid to date.

Mr. Feliciano is an employee in good standing, an asset to GWS and has done an outstanding job developing Strategic technology focused on revenue.

James R Bartlett
Chairmen & CEO

Date: 1-31-03

**GlobalWare East • Corporate Offices**
200 Ward Hill Avenue, Haverhill, MA 01835 • Tel: 978.469.7800 • Fax 978.469.7899

**GlobalWare West**
forest City, CA 94063 • 650.368.2800

**GlobalWare The Netherlands**
Schiphol-Rijk, The Netherlands • +31 (0) 20.650.8800

**GlobalWare Mexico**
Zapopan, Jalisco 45000 • (011) 525.684.8781

✎:JS 44  (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Alfred Feliciano

**DEFENDANTS**
Globalware Solutions, Inc.
Gary Lortie and Tony Rudston

(b) County of Residence of First Listed Plaintiff __Florida__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed __Essex__
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Christopher M. Waterman
Demeo & Associates, One Lewis Wharf
Boston, MA 02110   617-263-2600

Attorneys (If Known) Mark Burak and Sandra Kahn
Morse, Barnes-Brown & Pendleton
Reservoir Place, 1601 Trapelo Road
Waltham, MA 02451   781-622-5930

**II. BASIS OF JURISDICTION**  (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                  and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT**   (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury — | of Propesy 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgement | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product / ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability / ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIW C/DIW W (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury Product Liability | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | | or Defendant) | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | ☒ 791 Empl. Ret. Inc. | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | Security Act | | |

**V. ORIGIN**   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**   (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)
29 U.S.C. Sec. 1161. Defendant Globalware failed to comply with its COBRA obligations. Plaintiff suffered damages as a result.

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ $500,000 plus
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**   (See instructions):
JUDGE
DOCKET NUMBER

DATE
November 22, 2004

SIGNATURE OF ATTORNEY OF RECORD
_[signature]_

**FOR OFFICE USE ONLY**

RECEIPT #_____ AMOUNT_____ APPLYING IFP_____ JUDGE_____ MAG. JUDGE_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only) _Alfred Feliciano v. Globalware Solutions, Inc._

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

    [ ]  I.     160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

    [X]  II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
                740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.        for patent, trademark or copyright cases

    [ ]  III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                380, 385, 450, 891.

    [ ]  IV.    220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                690, 810, 861-865, 870, 871, 875, 900.

    [ ]  V.     150, 152, 153.

    04 - 12461

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

    None

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?

    YES [ ]    NO [X]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

    YES [ ]    NO [X]

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

    YES [ ]    NO [X]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

    YES [ ]    NO [X]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

    YES [ ]    NO [X]

    A.  If yes, in which division do all of the non-governmental parties reside?

        Eastern Division [ ]        Central Division [ ]        Western Division [ ]

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division [X]        Central Division [ ]        Western Division [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

    YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Christopher M. Waterman

ADDRESS  Demeo & Associates, One Lewis Wharf, Boston, MA 02110

TELEPHONE NO.  617-263-2600