UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALFRED FELICIANO,

        Plaintiff,

v.

GLOBALWARE SOLUTIONS, INC.
TONY RUDSTON, and
GARY LORTIE,

        Defendants.

and

GLOBALWARE SOLUTIONS, INC.,
and GARY LORTIE,

        Third-Party Plaintiffs,

v.

JAMES R. BARTLETT and
SCOTT BERNSTEIN,

        Third-Party Defendants.

Civil Action No. 04-12461-GAO

## THIRD-PARTY COMPLAINT

This third-party complaint asserts that James R. Bartlett ("Bartlett") and Scott Bernstein ("Bernstein") are liable to GlobalWare Solutions, Inc. ("GWS") and Gary Lortie ("Lortie") if any liability is found owing to Alfred Feliciano ("Feliciano") in connection with certain of Feliciano's claims in the above-referenced action (GWS and Lortie categorically deny any and all liability). Accordingly, GWS and Lortie seek indemnification and contribution for such liability. Additionally, this Third-Party Complaint asserts claims against Bartlett for breach of fiduciary duty, breach of the duty of loyalty, conversion, and civil conspiracy, which claims arise out of a

multi-faceted scheme by Bartlett and Feliciano to, among other things, direct thousands of dollars in unearned payments to Feliciano, and to defraud GWS, Lortie and this Court by concocting a false affirmation of an alleged employment agreement that intentionally and materially misrepresented Feliciano's relationship with GWS.

## PARTIES

1. Defendant and Third-Party Plaintiff GlobalWare Solutions, Inc. ("GWS") is a corporation organized under the laws of Delaware with a usual place of business at 200 Ward Hill Avenue, Massachusetts.

2. Defendant and Third-Party Plaintiff Gary A. Lortie is an individual residing at 9 Walnut Hill Road, Millis, Massachusetts.

3. On information and belief, Third-Party Defendant James R. Bartlett is an individual residing at 672 Chestnut Street, Lynnfield, Essex County, Massachusetts 01940. At times relevant hereto, Bartlett was the Chief Executive Officer of GWS and the Chairman of GWS' Board of Directors.

4. On information and belief, Third-Party Defendant Scott Bernstein is an individual residing at 129 Rattlesnake Hill Road, Andover, MA 01810. At times relevant hereto, Bernstein was GWS' treasurer.

## ALLEGATIONS

5. Plaintiff in the above-captioned action has filed against Defendants GWS and Lortie a complaint, a copy of which is attached as **Exhibit A**. As appears in Count III of the attached complaint, Plaintiff alleges that Defendants GWS and Lortie failed to pay him wages on a timely basis in violation of Massachusetts General Laws c. 149, § 148, et seq. More specifically, Plaintiff alleges that Defendants GWS and Lortie failed to pay him "salary, deferred

salary, vested vacation benefits, stock options and commissions." See Exhibit A, at ¶¶ 50, 51. GWS and Lortie emphatically deny such allegations.

6. At all times relevant to the alleged failures to pay wages, Bartlett was the Chief Executive Officer of GWS or was an officer or agent "having the management" of GWS within the meaning of Massachusetts General Laws c. 149, § 148.

7. At all times relevant to the alleged failures to pay wages, Bernstein was the Treasurer of GWS or was an officer or agent "having the management" of GWS within the meaning of Massachusetts General Laws c. 149, § 148.

8. GWS currently provides a variety of services including software contract manufacturing, fulfillment, digital content management, supply chain management, and e-commerce solutions for technology-based companies.

9. GWS's predecessor was ZBR Publications, Inc. ("ZBR"). ZBR was founded in 1978 as a full service print and documentation firm providing services to the defense industry and computer hardware manufacturers. Bartlett was one of ZBR's co-founders.

10. Bartlett served as President and Chief Executive Officer of ZBR and GWS, and was a shareholder of GWS. At all times relevant, Feliciano was a close personal friend of Bartlett.

11. Feliciano worked for GWS on an intermittent basis beginning in 1993 both as an independent consultant and occasionally as a regular employee until his employment relationship with GWS terminated in or about October of 2002 when Feliciano stopped working on behalf of GWS and when his salary payments terminated. As of the termination of his employment, Feliciano held the position of "Chief Strategy Officer." During all times when Feliciano worked

as an employee for GWS, Feliciano was an at-will employee and did not have an employment contract for a specific period.

12. Beginning in November, 2001, Mezzanine Management Fund III 'A', Mezzanine Management Fund III 'B', Mezzanine Management Fund III 'C', and Mezzanine Management Limited (collectively, "Mezzanine"), a private equity company, made investments in GWS and made subsequent investments in GWS in October of 2002 and February 2003. As a result of this third investment in February 2003, Mezzanine acquired a majority interest in GWS of approximately 55%.

13. On or about February 12, 2003, Bartlett resigned as GWS's President and Chief Executive Officer.

14. On or about February 12, 2003, GWS appointed the following corporate officers: (i) Anthony Rudston ("Rudston") as its Chief Executive Officer; (ii) Gary A. Lortie ("Lortie") as its acting Chief Financial Officer; and (iii) Ian Cameron ("Cameron") as its acting President.

15. As of February 12, 2003, the new executive team of Rudston, Lortie and Cameron assumed the day-to-day management of GWS.

16. Once in place, GWS's new management team discovered that Bartlett had improperly used corporate resources for his own personal benefit and that of his family and friends -- slowly draining GWS of its assets.

17. Effective May 30, 2003, Bartlett was removed as a GWS director for cause because of his gross mismanagement of GWS during calendar year 2002 through February 12, 2003.

18. Despite having held an officer position with GWS and owing GWS a fiduciary duty of loyalty and even though Plaintiff ceased to provide any services whatsoever to GWS in or

about October 2002, Feliciano continued to receive thousands of dollars in unearned payments from GWS based upon an inappropriate arrangement with Bartlett until GWS's new management discovered and terminated the scheme in February 2003.

19. Upon information and belief, Feliciano and Bartlett conspired to defraud the Company by concocting a false affirmation of Feliciano's alleged employment agreement (**Exhibit B** to Plaintiff's Complaint) which intentionally misrepresented Feliciano's relationship with GWS.

20. In September 2004, based in large part on the false affirmation fabricated by Feliciano and Bartlett, Feliciano demanded that GWS pay him hundreds of thousands of dollars, claiming breach of the supposed "contract." GWS sought further information regarding the validity of Feliciano's claims. Instead of responding with proof of his claims, Feliciano asserted baseless and false claims in this Court, including claims based on the false and fraudulent "affirmation" of his "contract" with GWS. In connection with such claims, Feliciano caused process to issue to Defendants, all with the malicious and ulterior motive and purpose of receiving additional sums of monies from GWS and/or Lortie to which he is not entitled.

21. GWS's new management team had no knowledge of this false affirmation until just before the commencement of this action.

### COUNT I
### (Breach of Duty of Loyalty by Bartlett)

22. GWS repeats and realleges the allegations in paragraphs 1 through 21 as if expressly set forth herein.

23. During all times pertinent, Bartlett owed GWS a common law duty of loyalty.

24. By reason of his foregoing acts, among others, Bartlett has breached the duty of loyalty that he owed to GWS.

25. By reason of his foregoing acts, among others, Bartlett is liable to GWS for the economic damages proximately caused by his breach of his common law duty of loyalty.

## COUNT II
### (Breach of Fiduciary Duty by Bartlett)

26. GWS repeats and realleges the allegations in paragraphs 1 through 21 as if expressly set forth herein.

27. As Chief Executive Officer, Chairman of the Board, and as a shareholder, Bartlett held a position of trust and confidence with GWS.

28. Bartlett owed fiduciary duties of good faith, fairness, care, loyalty and integrity to GWS and its stockholders and creditors.

29. By his actions, Bartlett has violated his fiduciary duties to GWS and its stockholders and creditors.

30. As a direct and proximate result of Bartlett's breach of his fiduciary duties to GWS and its stockholders and creditors, GWS has suffered substantial harm for which Bartlett is liable in an amount to be determined at trial.

## COUNT III
### (Civil Conspiracy)
### (Brought BY GWS and Lortie Against Bartlett)

31. GWS and Lortie repeat and reallege the allegations in paragraphs 1 through 21 as if expressly set forth herein.

32. As described at length above, Bartlett secretly and knowingly conspired with Feliciano to inappropriately divert thousands of dollars in unearned payments from GWS to Feliciano. Bartlett and Feliciano also conspired to defraud the Company and this Court by concocting a false affirmation of Feliciano's alleged employment agreement which intentionally

misrepresented Feliciano's relationship with GWS. They did so in a manner to cause grievous harm to GWS and Lortie and to unlawfully benefit themselves.

33. By reason of their foregoing acts, among others, Bartlett engaged with Feliciano in civil conspiracy and Bartlett is liable to GWS and Lortie for all economic damage proximately caused by the conspiracy.

## COUNT IV
### (Indemnification and Contribution)
### (Brought By GWS and Lortie Against Bartlett and Bernstein)

34. GWS and Lortie repeat and reallege the allegations in paragraphs 1 through 21 as if expressly set forth herein.

35. By the above-captioned action, Feliciano has claimed damages, costs and attorneys' fees arising from the alleged conduct of GWS and Lortie in allegedly failing to pay him wages and benefits due him. At the time of the alleged failure to pay wages and benefits, Bartlett was Chief Executive Officer of GWS and Bernstein was Treasurer, and, as such, both Bartlett and Bernstein were obligated to ensure that GWS timely paid its employees wages due under applicable laws.

36. GWS and Lortie deny liability to Feliciano and further deny that GWS owed Feliciano any wages. However, to the extent that any damages, costs and attorneys' fees are awarded to Feliciano in the above-captioned action, such damages result entirely from Bartlett's and Bernstein's acts or omissions.

37. If any liability is found owing to Feliciano in the above-captioned action, then GWS and Lortie are entitled to indemnification and contribution from Bartlett and Bernstein, individually and collectively, jointly and severally, for all such liability.

WHEREFORE, GWS, and Lortie with respect to Counts III and IV, respectfully request that this Court award it the following relief:

A. Damages in an amount determined to have been suffered by GWS and Lortie at the hands for Third-Party Defendant Bartlett;

B. Indemnification and contribution from the Third-Party Defendants, Bartlett and Bernstein, for the full amount of any damages, if any, that this Court awards Feliciano on Count III of his Complaint;

C. The costs of this third-party action, including reasonable attorneys' fees; and

D. All such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Third-Party Plaintiffs GWS and Lortie request a trial by jury on all of its claims so triable.

GLOBALWARE SOLUTIONS, INC.,
and GARY LORTIE

By their attorneys,

/s/ Scott Connolly
Mark H. Burak, BBO # 558805
Sandra E. Kahn, BBO # 564510
Scott J. Connolly, BBO # 651007
MORSE, BARNES-BROWN & PENDLETON, P.C.
Reservoir Place
1601 Trapelo Road
Waltham, MA 02451
(781) 622-5930
(781) 622-5933 (facsimile)

Dated: February 22, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by first class mail on February 22, 2005.

/s/ Scott J. Connolly
Scott J. Connolly

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALFRED FELICIANO,<br><br>Plaintiff,<br><br>v.<br><br>GLOBALWARE SOLUTIONS, INC.,<br>TONY RUDSTON, and<br>GARY LORTIE<br><br>Defendants. | Civil Action No.<br><br>COMPLAINT AND JURY DEMAND |

## INTRODUCTION

This is an action for damages and other relief arising out the employment of Plaintiff Alfred Feliciano ("Plaintiff" or "Feliciano") by Defendant Globalware Solutions, Inc. ("Globalware"), Tony Rudston ("Rudston"), and Gary Lortie ("Lortie") (collectively "Defendants"). Mr. Feliciano's claims include breach of contract, fraud, violation of the Payment of Wages Law, violations of his rights under the Employment Retirement Income Security Act of 1974 ("ERISA"), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"), 29 U.S.C. § 1161, *et seq.*, and breach of the implied covenant of good faith and fair dealing.

## PARTIES

1. Plaintiff Feliciano is an individual residing at 2607 Oakbrook Court, Weston, Florida. Plaintiff is over the age of 40.

2. Defendant Globalware is a Delaware corporation, with its principal place of business at 200 Ward Hill Avenue, Haverhill, Essex County, Massachusetts.

3. On information and belief, Defendant Rudston is the Chief Executive Officer of

Globalware.

4. On information and belief, Defendant Lortie is the Chief Financial Officer of Globalware. He resides at 9 Walnut Hill Road, Millis, Massachusetts.

## JURISDICTION AND VENUE

5. The District Court of the United States for the District of Massachusetts has original jurisdiction of this matter under the provisions of 28 U.S.C. §§ 1331 and 1332 in that it is a civil action arising under the laws of the United States, specifically the Employee Retirement Security Act ("ERISA"), as amended by the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA"). Furthermore, there is complete diversity of citizenship among the parties and the amount-in-controversy exceeds $75,000.

## FACTUAL BACKGROUND

### Feliciano's Employment Contract

6. In or about June 2000, Globalware entered into a contract with Feliciano in which it agreed to employ him as its Chief Resource Officer for a term of five years (the "Contract").

7. The terms of the Contract, memorialized at a later date by Globalware's then Chief Executive Officer, James Bartlett, consisted of: an annual salary of $200,000; medical, dental and disability insurance, including short and long term disability, life insurance; monthly car allowance of $600; severance payment equaling six (6) months pay in the event of dismissal without cause before the expiration of the Contract; continued health benefits during the six month severance period; and 4.5% commission payment for all transactions.

8. The Contract also provided pursuant to the "Incentive Stock Option Agreement," Globalware conveyed 200,000 shares in Globalware to Feliciano which would incrementally vest

over 4 years. See, a true and accurate copy of the "Incentive Stock Option Agreement," attached hereto as Exhibit A (the "Option Agreement").

9. Globalware has refused to comply with the terms of the Option Agreement.

10. In early 2002, Globalware encountered financial difficulties. In an attempt to navigate its financial difficulty, Globalware requested that certain executives defer portions of their salary so that Globalware could strengthen its financial condition. Feliciano, along with several other employees, agreed to defer 50% of his salary, or $100,000. He did so with Globalware's express agreement that this $100,000 would be repaid to Feliciano in 2003.

11. The Contract also provided that Feliciano was to receive a commission of 4.5% of any contract generated by Feliciano.

12. In December 2000, Feliciano closed on a deal with Avaya, Inc. in the amount of approximately $1,300,000.

13. Accordingly, Feliciano was entitled to a commission payment for the Avaya deal in the amount of $58,500.

14. Globalware refused to make this payment to Feliciano.

**Feliciano's Accident and Globalware's Insurance Fraud**

15. On September 27, 2002, while performing duties related to his employment with Globalware, Feliciano was involved in an automobile accident. As a result of the accident, Feliciano suffered four herniated discs in his neck. Feliciano also suffered extensive nerve damage in his back and neck.

16. Shortly thereafter, Feliciano discussed the accident and his injuries with Globalware. Despite Feliciano's request to file a workers' compensation claim, Globalware convinced him

3

not to file such a claim because it would pay all of his medical bills and salary.

17. As a result of these injuries, Feliciano was forced to go on short term disability leave. On or about October 17, 2002, Feliciano received the first disability payment from Globalware, which was purportedly reimbursed for these payments by Hartford Life and Accident Insurance Company ("Hartford").

18. In addition to his short term disability policy with Hartford (the "Hartford Policy"), Feliciano also opted to participate in Globalware's supplemental disability policy with Colonial Insurance (the "Colonial Policy").

19. Feliciano enrolled in the Colonial Policy in order to provide himself with additional coverage in excess of the Hartford Policy (which only covered a portion of his full salary) in the event of his disability.

20. In order to pay the premium for the Colonial Policy, Globalware deducted $13.83 from Feliciano's weekly paycheck which it then transferred to Colonial for payment.

21. On or about May 10, 2002, despite continuing to deduct monies from Feliciano's paycheck for the Colonial Policy premium, Globalware ceased making payments to Colonial for the Colonial Policy on behalf of Feliciano. Globalware never notified Feliciano that it had stopped making these payments. Because Globalware continued to withdraw the $13.83 from Feliciano's weekly paycheck, Feliciano was unaware that Globalware had allowed the Colonial Policy to lapse.

22. It was not until late 2002, after he suffered his injury and attempted to collect on his supplemental disability, that Feliciano first discovered that the Colonial Policy had lapsed and he no longer had this supplemental disability coverage.

23. As an employee of Globalware with a salary of $50,000 or more, Feliciano was automatically enrolled in the long term disability program with Sun Life Assurance (the "Sun Life Policy"). On information and belief, Feliciano was entitled to disability payments if he could not return to work after six months of short term disability leave.

24. Because of the severity of the injuries suffered on September 27, 2002, Feliciano was unable to return to work after six months. Globalware never apprised Feliciano of his rights to file for disability payments pursuant to the Sun Life Policy.

### Globalware's Ratification of the Contract and its Breach

25. In December 2002, Feliciano requested that its then Chief Executive Officer, James Bartlett, memorialize, *inter alia*, the terms of his employment agreement consistent with the Contract.

26. In January 2003, Mr. Bartlett prepared the document, in which he confirmed the primary terms of Feliciano's employment, including but not limited to the following: Globalware still owed Feliciano his deferred salary of $100,000; he was under contract through May 2005; he was to receive 200,000 shares of Globalware, fully vested in 4 years; commission payment for the Avaya deal (see para. 12); and in excess of $52,000 in reimbursable expenses. See, a true and accurate copy Bartlett's 2003 Employment Memo, attached hereto as Exhibit B.

27. In March 2003, Globalware suddenly stopped making payments to Feliciano. It failed to provide him with any written notification that they were stopping the payments, nor did it give him any reason for stopping the payments. To date, Feliciano has never received any communication from Globalware concerning the cessation of these payments.

28. In an attempt to ascertain the reason for the stopped payments, Feliciano contacted

5

Globalware and requested that it provide him with a copy of his personnel file. Globalware, and more specifically Bradley Jay, Managing Director of Mezzanine Management Company, refused this request. Mr. Jay also refused to return any of Feliciano's personal items from his work area.

29. In or about the Spring of 2003, Feliciano spoke with Globalware's new CEO, Tony Rudston. When Feliciano asked about the status of his unpaid expenses, which totaled over $53,000, Mr. Rudston simply told him to stand in line with the other creditors. Rather than attempt to work with Feliciano regarding the reimbursement of these expenses, Rudston told Feliciano to file a lawsuit.

30. In early 2003, Feliciano presented three Globalware checks totaling $6,665.89 to his bank for payment. All three checks were returned to Feliciano unpaid because of insufficient funds.

31. On information and belief, Feliciano has since learned that Globalware terminated his employment in March of 2003. Globalware did not provide Feliciano with any notice, either verbal or written, of the termination, nor did it pay him his unpaid wages and expenses, or advise him concerning his rights with regard to other benefits.

### Globalware's COBRA and ERISA Violations

32. Globalware also failed to provide Feliciano with any notice of his rights to continue his health insurance coverage pursuant to COBRA. Incredibly, despite being advised that Globalware was required to provide such notice, the Director of Human Resources, Richard Dauphinais, advised Globalware's insurance broker that he was not going to concern himself with the COBRA notification requirements.

33. In addition to failing to provide Feliciano with notice of his COBRA rights, Globalware also failed to extend or continue Feliciano's health insurance benefits.

34. In June 2003, Benefirst Health Insurance cancelled Feliciano's health insurance policy, leaving Feliciano, his spouse and children, without any health insurance. Because of the termination of his health insurance, Feliciano was forced to cancel several doctor's and therapist's appointments because he was no longer covered.

35. Because he was forced to miss these appointments, Feliciano's condition worsened, both emotionally and physically.

36. Feliciano has incurred significant medical expenses that would have been covered by his health insurance with Globalware had it been active, as it should have been. These medical bills are in excess of $75,000.

37. Globalware also failed to provide Feliciano with notice of his rights pursuant to the Stock Option Plan, or his rights concerning Globalware's pension plan.

38. On or about August 3, 2003, Feliciano applied for unemployment compensation. He was shocked to discover that Globalware had terminated his position in March 2003, and moreover that Globalware had grossly under reported his wages.

39. Globalware's fraudulent and callous conduct has caused Feliciano to suffer severe emotional and physical injuries, including, but not limited to emotional distress over the mounting medical bills and the unnecessary exacerbation of his serious physical injuries.

## COUNT I
### (Breach of Contract - Feliciano v. Globalware)

40. Feliciano repeats and incorporates herein by reference the allegations of Paragraphs 1-39 above.

41. In or about June 2000, Globalware entered into the Contract with Feliciano to employ

7

him for a period of five years at a base salary of $200,000. The Contract contained several other important terms, as further set out in Exhibit B.

42. By terminating Feliciano's employment without cause and in violation of the Contract and by its failure to comply with the other terms of the Contract, Globalware breached the Contract.

43. Globalware also breached the terms of the Option Agreement.

44. Globalware's breach of the Contract and the Option Agreement has caused Feliciano significant financial, emotional, and physical damages.

### COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing
### Feliciano v. Globalware)

45. Feliciano repeats and incorporates herein by reference the allegations of Paragraphs 1-44 above.

46. Globalware breached the implied covenant of good faith and fair dealing by wrongfully terminating Feliciano in violation of the Contract and by refusing to perform its obligations under the Option Agreement.

47. Globalware's actions have deprived Feliciano of the fruits and benefits of the Contract and the Option Agreement. These fruits, include, but are not limited to, Feliciano's vested vacation benefits and reimbursable expenses, loss of vested stock options, loss of income, loss of benefits and loss of professional opportunities.

48. As a result of Globalware's breach of the implied covenant of good faith and fair dealing, Feliciano suffered substantial emotional, physical, and financial damages.

## COUNT III
(Violation of Payment of Wages Law - G.L. c. 149, 27C, 148 and 150 –
Feliciano v. all Defendants)

49. Feliciano repeats and incorporates herein by reference paragraphs 1 through 48 above.

50. Globalware employed Feliciano and agreed to pay him an annual salary of $200,000, deferred salary, vested vacation benefits, stock options and commission. Defendants' were to pay these wages on a weekly basis. Defendants' failed to pay Feliciano his wages and the aforementioned benefits.

51. Defendants' failure to pay Feliciano his full wages, vested vacation benefits, earned commissions, vested stock options, and reimbursable expenses on a timely basis are willful acts in violation of Massachusetts General Laws, Chapter 149.

52. Defendants' failure to pay Feliciano his wages on a timely basis is a violation of the Payment of Wages Law, sections 27C, 148 and 150 of Chapter 149 of the General Laws of Massachusetts.

53. Plaintiff Feliciano complied with all procedural prerequisites as articulated in G.L. c. 149, and has received written approval from the Massachusetts Attorney General to pursue his wage claims against Defendants.

54. Feliciano has suffered extensive damages as a result of Defendants' violations of G.L. c. 149.

55. As the result of Defendants' willful failure to pay Feliciano's wages, Feliciano is entitled to recover multiple damages, statutory fines, attorney's fees and litigation costs.

## COUNT IV
### (Fraud - Feliciano v. Globalware)

56. Feliciano repeats and incorporates herein by reference paragraphs 1 through 55 above.

57. Globalware engaged in fraud by ceasing payments to Colonial for Feliciano's Colonial Policy, while continuing to withdraw and retain premium payments from Feliciano's weekly paycheck, thereby leading Feliciano to believe that his Colonial Policy remained active.

58. Globalware never notified Feliciano that it had stopped making the premium payments to Colonial on his behalf or that the Colonial Policy had lapsed.

59. Globalware also engaged in fraud by persuading Feliciano to forego his statutory right to file for and collect workers' compensation payments based on the promise that it would compensate him instead.

60. As a result of Globalware's fraud, Feliciano suffered significant damages.

## COUNT V
### (Violation of 29 U.S.C. § 1162 - Feliciano v. Globalware)

61. Feliciano repeats and incorporates herein by reference paragraphs 1 through 60 above.

62. The acts and practices of Globalware alleged above constitute an unlawful failure to extend continuation coverage of health benefits to Feliciano as required by 29 U.S.C. § 1162.

63. Globalware's aforementioned conduct was done willfully and intentionally, and as a result Feliciano suffered significant damages.

## COUNT VI
### (Violation of 29 U.S.C. § 1166 - Feliciano v. Globalware)

64. Feliciano repeats and incorporates herein by reference paragraphs 1 through 61 above.

65. The acts and practices of Globalware alleged above constitute an unlawful failure to

notify Feliciano of his right to continuation coverage of health benefits as required by 29 U.S.C. § 1166.

66. Globalware's aforementioned conduct was done willfully and intentionally, and as a result Feliciano suffered significant damages.

WHEREFORE, Feliciano demands:

i. That the Court enter judgment in favor of Feliciano on each Count of the Complaint;

ii. That the Court enter judgment in his favor and against all Defendants on Count III of the Complaint for Defendants' violation of G.L. c. 149, 27C, 148 and 150 for multiple damages, plus costs, interest, and attorney's fees;

iii. That the Court enter judgment in his favor and against Globalware on Count V of the Complaint for damages, plus costs, interest, and attorney's fees;

iv. That the Court enter judgment in his favor and against Globalware on Count VI of the Complaint and assess a statutory penalty of $110 per day for each day of Globalware's failure to comply with COBRA, plus costs, interest, and attorney's fees;

v. That the Court award Feliciano his attorney's fees, interest and the costs of suit; and

vi. That the Court enter such additional relief as it deems just and equitable.

JURY DEMAND

Feliciano hereby demands a trial by jury on all issues so triable.

Respectfully submitted,
ALFRED FELICIANO

By his attorneys,

Joseph L. Demeo, BBO# 561254
Christopher M. Waterman, BBO# 641190
Demeo & Associates, P.C.
One Lewis Wharf
Boston, MA 02110
(617) 263-2600

Dated: November 22, 2004